1  Paul L. More, Bar No. 9228
2  Eric B. Myers, Bar No. 8588
   Kimberly C. Weber, Bar No. 14434
3  **MCCRACKEN, STEMERMAN & HOLSBERRY, LLP**
4  1630 S. Commerce Street, Suite A-1
   Las Vegas, NV 89102
5  Tel.: 702-386-5107
   Fax: 702-386-9848
6  Emails:  pmore@msh.law
7           ebm@msh.law
            kcw@msh.law
8
9  *Attorneys for Proposed Intervenor Local Joint Executive Board*

10              **IN THE UNITED STATES DISTRICT COURT**

11                 **FOR THE DISTRICT OF NEVADA**

12  RED ROCK RESORTS, INC, et al.,              **No. 24-cv-01966-JCM-BNW**
13
                    Plaintiffs,
14
                                                **PROPOSED INTERVENOR**
15  v.                                          **LOCAL JOINT EXECUTIVE**
                                                **BOARD OF LAS VEGAS'S**
16  NATIONAL LABOR RELATIONS BOARD,             **MOTION FOR LEAVE TO FILE**
    a federal administrative agency, et al.,    **[proposed] BRIEF IN**
17                                              **OPPOSITION TO MOTION FOR**
                    Defendants.                 **PRELIMINARY INJUNCTION**
18
19
20
21
22
23
24
25
26
27
28

Motion for Leave to File                        Case No. 24-cv-01966-JCM-BNW

On December 18, 2024, Proposed Intervenor Local Joint Executive Board of Las Vegas ("LJEB") filed its unopposed motion to intervene in this case. Doc. 19. LJEB requested that should its motion to intervene be granted, that it also be granted leave to file a brief in opposition to Plaintiffs' preliminary injunction motion on the same schedule as the existing Defendants. Doc. 19, at 14-15. The existing Defendants were granted until December 27, 2024 to file their opposition to Plaintiffs' preliminary-injunction motion. Doc. 16.

The Court has not yet ruled on LJEB's motion to intervene. Accordingly, LJEB now moves the Court for leave to file the attached brief in opposition to Plaintiffs' motion for preliminary injunction and accompanying Declaration of Kevin Kline at such time as the Court grants LJEB motion to intervene.

Dated: December 27, 2024          Respectfully submitted,


*/s/Paul L. More*
Paul L. More, Bar No. 9228
Eric B. Myers, Bar No. 8588
Kimberly C. Weber, Bar No. 14434
**MCCRACKEN, STEMERMAN & HOLSBERRY, LLP**
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102
Tel.: 702-386-5107
Fax: 702-386-9848
Emails:  pmore@msh.law
             ebm@msh.law
             kcw@msh.law

*Attorneys for Proposed Intervenor Local Joint Executive Board*

Motion for Leave to File                    Case No. 24-cv-01966-JCM-BNW

Attachment to Motion for Leave to File –
[proposed] Brief in Opposition to
Plaintiff's Motion for Preliminary
Injunction

Paul L. More, Bar No. 9228
Eric B. Myers, Bar No. 8588
Kimberly C. Weber, Bar No. 14434
**MCCRACKEN, STEMERMAN & HOLSBERRY, LLP**
1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102
Tel.: 702-386-5107
Fax: 702-386-9848
Emails:  pmore@msh.law
         ebm@msh.law
         kcw@msh.law

*Attorneys for Proposed Intervenor Local Joint Executive Board*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| RED ROCK RESORTS, INC., et al., | No. 24-cv-01966-JCM-BNW |
| Plaintiffs, | |
| v. | **LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS'S [proposed] BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUCTION** |
| NATIONAL LABOR RELATIONS BOARD, a federal administrative agency, et al., | |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ...............................................................................2

ARGUMENT ......................................................................................................7

   I.   Plaintiffs Are Unlikely to Succeed on Their Constitutional Claims. ......................7

     A.  Plaintiffs' removal-power claim is untenable. ....................................................8

       1.   Plaintiffs face no constitutional harm because the President has expressed no desire to remove the relevant officers. ....................................................8

       2.   *Axon Entertainment Ltd. v. FTC* does not support Plaintiffs' claim. .............10

       3.   The remedy that Plaintiffs seek is illogical. ....................................................11

     B.  Plaintiffs cannot succeed on their Seventh Amendment claim. ........................12

       1.   Plaintiffs raise a statutory claim, not a constitutional one. .............................12

       2.   Plaintiffs' challenge to the NLRB's remedial authority must be brought through the NLRA's judicial-review procedures. ..................................................15

       3.   Plaintiffs' Seventh Amendment claim is not ripe. .........................................16

       4.   In any case, Plaintiffs' Seventh Amendment claim is meritless. ...................17

     C.  Plaintiffs Separation-of-Powers Argument Cannot Prevail. .............................18

   II.  The Balance of Harms Clearly Weighs Against an Injunction. ...........................21

   III.   This Court Lacks Jurisdiction Under the Norris-LaGuardia Act. ......................23

**CONCLUSION** ...............................................................................................23

Local Joint Executive Board's Opp. Br.               Case No. 24-cv-01966-JCM-BNW

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                                          **Page(s)**

3
*Agostini v. Felton*,
4
    521 U.S. 203 (1997)...................................................................................................18

5
*Alivio Medical Center v. Abruzzo*,
6
    No. 24-cv-7217, 2024 WL 4188068 (N.D. Ill. Sept. 13, 2024)....................................7

7
*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
8
    121 F.4th 1314 (D.C. Cir. 2024)..................................................................................21

*Ares Collective Group LLC v. NLRB*,
9
    No. 24-cv-00517, 2024 WL 4581436 (D. Ariz. Oct. 25, 2024) ............................7, 21

10
*Ashwander v. Tennessee Valley Auth.*,
11
    297 U.S. 288 (1936) (Brandeis, J., concurring)..........................................................15

12
*Atlas Roofing Co. v. OSHRC*,
13
    430 U.S. 442 (1977)...............................................................................................17, 18

14
*Aunt Bertha v. NLRB*,
15
    No. 24-cv-00798, 2024 WL 4202383 (N.D. Tex. Sept. 16, 2024)................................8

16
*Axon Enterprise, Inc. v. FTC*,
17
    598 U.S. 175 (2023)............................................................................................*passim*

18
*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) ....................................................................................21
19

20
*Calcutt v. Fed. Deposit Ins. Corp.*,
    37 F.4th 293 (6th Cir. 2022), *rev'd on other grounds*, 598 U.S. 623
21
    (2023).............................................................................................................................9

22
*Care One LLC. v. NLRB*,
23
    680 F.Supp.3d 540 (D. N.J. 2023) ...............................................................................7

24
*Carney v. Adams*,
25
    592 U.S. 53 (2020).......................................................................................................15

26
*CFPB v. CashCall, Inc.*,
    35 F.4th 734 (9th Cir. 2022) ........................................................................................9

27

28

ii

*CFPB v. Future Income Payments, LLC*,
   No. 8:17-CV-00303-JLS-SS, 2017 WL 5635401 (C.D. Cal. May 23,
   2017) ........................................................................................................... 22

*CFPB v. Law Offices of Crystal Moroney P.C.*,
   63 F.4th 174 (2d Cir. 2023) ........................................................................ 9

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*,
   51 F.4th 616 (5th Cir. 2022), *rev'd on other grounds*, 601 U.S. 416
   (2024) .......................................................................................................... 9

*Collins v. Yellen*,
   594 U.S. 220 (2021) .......................................................................... *passim*

*Consolidated Edison Co. of New York v. NLRB*,
   305 U.S. 197 (1938) ................................................................................... 13

*Consumers' Rsch. v. CPSC*,
   91 F.4th 342 (5th Cir. 2024) ..................................................................... 11

*Curtis v. Loether*,
   415 U.S. 189 (1974) ................................................................................... 17

*Decker Coal Co. v. Pehringer*,
   8 F.4th 1123 (9th Cir. 2021) ................................................................. 9, 12

*E.I. du Pont de Nemours & Co. v. NLRB*,
   489 F.3d 1310 (D.C. Cir. 2007) (Kavanaugh, J.) ..................................... 17

*Eisenberg v. Holland Rantos Co.*,
   583 F.2d 100 (3d Cir. 1978) ...................................................................... 19

*Energy Transfer, LP v. NLRB*,
   No. 24-cv-198, 2024 WL 3571494 (S.D. Tex. July 29, 2024) ................... 8

*Env't Prot. Info. Ctr. v. Carlson*,
   968 F.3d 985 (9th Cir. 2020) ....................................................................... 7

*Evans v. Int'l Typographical Union*,
   76 F. Supp. 881 (S.D. Ind. 1948) .............................................................. 20

*Flamingo Hilton-Laughlin v. NLRB.*,
   148 F.3d 1166 (D.C. Cir. 1998) ............................................................ 2, 19

*Frankl v. HTH Corp.*,
   650 F.3d 1334 (9th Cir. 2011) ............................................................ 21, 22

iii

*HonorHealth v. NLRB,*
No. 24-cv-03009-PHX-DJH, 2024 WL 4769772 (D. Ariz. Nov. 13, 2024) ........................................................................................7

*Humphrey's Executor v. United States,*
295 U.S. 602 (1935) ..................................................................12, 18

*John Doe Co. v. Consumer Fin. Prot. Bureau,*
849 F.3d 1129 (D.C. Cir. 2017) .................................................22

*Kaufmann v. Kijazaki,*
32 F.4th 843 (9th Cir. 2022) ...................................................8, 10

*Kessel Food Mkts., Inc. v. NLRB,*
868 F.2d 881 (6th Cir. 1989) ...................................................19

*Leachco, Inc. v. Consumer Product Safety Comm'n,*
103 F.4th 748 (10th Cir. 2024) ..............................9, 10, 11, 21

*Loren Cook Company v. NLRB,*
No. 24-cv-03277-BCW, 2024 WL 5004534 (W.D. Mo. Nov. 27, 2024) ....................7

*Lucia v. Sec. & Exch. Comm'n,*
585 U.S. 237 (2018) .................................................................8

*Martin v. Occupational Safety & Health Rev. Comm'n,*
499 U.S. 144 (1991) ...............................................................18

*Nexstar Media, Inc. v. NLRB,*
No. 24-cv-01415, 2024 WL 4127090 (N.D. Ohio Aug. 26, 2024) ............................7

*NLRB v. Aaron Bros. Corp.,*
563 F.2d 409 (9th Cir. 1977) ...................................................19

*NLRB v. Electro–Voice, Inc.,*
83 F.3d 1559 (7th Cir. 1996) ...................................................22

*NLRB v. Exchange Parts Co.,*
375 U.S. 405 (1964).................................................................4

*NLRB v. Jones & Laughlin Steel Co.,*
301 U.S. 1 (1937)...........................................................*passim*

*NLRB v. Sanford Home for Adults,*
669 F.2d 35 (2d Cir. 1981) ......................................................19

Local Joint Executive Board's Opp. Br.                    Case No. 24-cv-01966-JCM-BNW

*NP Red Rock LLC*,
    373 NLRB No. 67, 2024 WL 3063775 (June 17, 2024).....................................1, 3, 4, 5

*Overstreet v. Lucid USA Inc.*,
    No. 24-cv-01356-PHX-DJH, 2024 WL 4186825 (D. Ariz. Sept. 13,
    2024) ..................................................................................................................22

*Overstreet v. Lucid USA Inc.*,
    No. 24-cv-01356-PHX-DJH, 2024 WL 5200484 (D. Ariz. Dec. 23,
    2024) ..............................................................................................................7, 12

*Overstreet v. NP Red Rock, LLC*,
    No. 22-cv-02351-GMN-VCF, 2021 WL 3064120 (D. Nev. July 20,
    2021), *aff'd*, No. 21-16220, 2021 WL 5542167 (9th Cir. Nov. 26,
    2021) ................................................................................................................1, 3

*Phelps Dodge Corp. v. NLRB*,
    313 U.S. 177 (1941).............................................................................................16

*Republic Steel Corp. v. NLRB*,
    311 U.S. 7 (1940)................................................................................................13

*Riley's Am. Heritage Farms v. Elsasser*,
    32 F.4th 707 (9th Cir. 2022) ..............................................................................22

*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020) ..............................................................................22

*Schaub v. W. Michigan Plumbing & Heating, Inc.*,
    250 F.3d 962 (6th Cir. 2001) ..............................................................................22

*SEC v. Jarkesy*,
    144 S. Ct. 2117 (2024)....................................................................................13, 18

*Seila Law LLC v. Consumer Financial Protection Bureau*,
    591 U.S. 197 (2020)..........................................................................................8, 11

*Seton v. NLRB*,
    No. 24-cv-01176-ADA, 2024 WL 4678057 (W.D. Tex. Oct. 18, 2024) ....................8

*Space Expl. Technolo-Gies Corp. v. NLRB*,
    No. 24-cv-00203-ADA, 2024 WL 3512082 (W.D. Tex. July 23, 2024) ...................7

*Spector Motor Service, Inc. v. McLaughlin*,
    323 U.S. 101 (1944)............................................................................................14

v

*Spring Creek Rehab. & Nursing Center LLC v. NLRB*,
    No. 24-cv-09016, 2024 WL 4563789 (D. N.J. Oct. 24, 2024) ............................7, 10

*Thomas v. Union Carbide Agr. Prod. Co.*,
    473 U.S. 568 (1985) ....................................................................................................17

*Thryv, Inc.*, 372 NLRB No. 22, at \*14 (Dec. 13, 2022), *vacated in part by Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024) ....................................17

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ......................................................................10, 15, 16

*United States v. Kaluna*,
    192 F.3d 1188 (9th Cir. 1999) (*en banc*) ....................................................14

*VHS Acquisition Subsidiary No. 7 v. NLRB*,
    No. 24-cv-02577-THM, 2024 WL 4817175 (D.D.C. Nov. 17, 2024)..........2, 7, 16, 23

*Walker v. City of Berkeley*,
    951 F.2d 182 (9th Cir. 1991) ..............................................................20, 21

*Winter v. Na. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)....................................................................................7

*Withrow v. Larkin*,
    421 U.S. 35 (1975)..............................................................................2, 19

*YAPP USA Auto Sys., Inc. v. NLRB*,
    No. 24-cv-12173, 2024 WL 4119058 (E.D. Mich. 2024), *denying injunction pending appeal,* No. 24-1754, 2024 WL 4489598 (6th Cir. Oct. 13, 2024), *writ of injunction denied* No. 24A348, 2024 WL 4508993 (S. Ct. Oct. 15, 2024) (Kavanaugh, J.)....................................7, 16

*YAPP USA Automotive Systems, Inc. v. NLRB*,
    No. 24-1754, 2024 WL 4489598 (6th Cir. Oct. 13, 2024) ........................10

**Statutes**

5 U.S.C. § 7521 ................................................................................................12

15 U.S.C. §§ 77h-1(g), 78u-2(b), 80b-3(i) .....................................................14

29 U.S.C. § 101 ................................................................................................23

29 U.S.C. § 113(c)............................................................................................23

29 U.S.C. § 153(d) ........................................................................................... 20

29 U.S.C. § 156 ................................................................................................ 18

29 U.S.C. §§ 160(e)–(f) .............................................................................. 15, 17

29 U.S.C. § 160(j) ................................................................................... 3, 18, 20

29 USC § 107(b) ............................................................................................... 23

National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ........................... 2, 13, 18

Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq* ......................................... 2, 23

Taft-Hartley Act ............................................................................................... 20

**Constitutional Provisions**

U.S. CONST. amend. I ...................................................................................... 22

U.S. CONST. amend. II ..................................................................................... 22

U.S. CONST. amend. V ..................................................................................... 18

U.S. CONST. amend. VII ........................................................................... *passim*

U.S. CONST. art. II, § 1, cl. 1 ............................................................................ 8

U.S. CONST. art. II, § 3, cl. 1 ............................................................................ 1

**Regulations**

29 C.F.R. § 101.16 ........................................................................................... 17

15 Fed. Reg. 6924 (Oct. 14, 1950) .................................................................. 20

**Other Authorities**

Daniel Wiessner, "US Senate rejects Biden labor board nominee, teeing up
    Republican control," Reuters (Dec. 12, 2024),
    https://www.reuters.com/world/us/us-senate-rejects-biden-labor-board-
    nominee-teeing-up-republican-control-2024-12-11/ ................................ 21

**INTRODUCTION**

Plaintiffs Red Rock Resorts Inc., its subsidiary Station Casinos LLC ("Station"), and Station-owned casinos have engaged in a multi-year campaign of illegal labor practices in an effort to deny Station employees union representation. That campaign has involved, among many other unlawful practices, illegal firings of union supporters, the selective offering of benefits in order to thwart union organizing, the unlawful withdrawal of recognition at union-represented properties, and blacklisting union supporters when recalling employees from COVID-related layoffs. The National Labor Relations Board ("NLRB" or "Board") has characterized Plaintiffs' campaign as "extensive coercive and unlawful misconduct stemm[ing] from a carefully crafted corporate strategy intentionally designed at every step to interfere with employees' free choice[,]" *NP Red Rock LLC*, 373 NLRB No. 67, 2024 WL 3063775, at *6 (June 17, 2024), and this Court has found it to be so "outrageous" and "pervasive" that the Board's traditional remedies are inadequate. *Overstreet v. NP Red Rock, LLC*, No. 22-cv-02351-GMN-VCF, 2021 WL 3064120, at *10 (D. Nev. July 20, 2021), *aff'd*, No. 21-16220, 2021 WL 5542167 (9th Cir. Nov. 26, 2021) (citation and internal quotation marks omitted).

Proposed Intervenor Local Joint Executive Board of Las Vegas ("LJEB" or the "Union") began winning union-representation elections at Station's casinos in 2016. Plaintiffs' campaign of unfair labor practices began shortly afterwards. And yet nine years later, Station employees are still waiting for justice. Plaintiffs' copycat challenges to the NLRB's structure are yet another attempt to use Station's financial resources to obstruct the Board's procedures.

Plaintiffs have no likelihood of success on the merits. They claim that the President's duty to "take Care that the Laws be faithfully executed" is being impeded by removal protections for NLRB members and administrative law judges whom the President has not shown a desire to remove. *See* U.S. CONST. art. II, § 3, cl. 1. Even if Plaintiff's removal-power claim had any merit, which it does not, Plaintiffs cannot show any "caus[al] harm" entitling them to relief. *Collins v. Yellen*, 594 U.S. 220, 259-60 (2021). Plaintiffs' reliance on the "here-and-now" injury that established federal jurisdiction in *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) is misplaced. Moreover, even if Plaintiffs were correct, the remedy would be to

1

1  enjoin reliance on the allegedly offending removal restrictions, not enjoin the administrative

2  proceedings.

3        Plaintiffs' Seventh Amendment claim fares no better. Plaintiffs' argument, in fact, is that

4  the NLRB lacks *statutory* authority to impose the remedies it allegedly seeks in the underlying

5  proceeding. Plaintiffs argue that the NLRB is seeking "legal" remedies "not countenanced by

6  the relevant statutory provision." Doc. 13, at 3 n.4. But this question of statutory authority (not

7  of constitutional right) must be brought in a later appeal under Congress's judicial-review

8  scheme. Even if Plaintiffs were bringing a Seventh Amendment claim, rather than a statutory

9  one, it would not be ripe, and even if it were ripe, it lacks merit. *See NLRB v. Jones & Laughlin*

10  *Steel Co*., 301 U.S. 1 (1937).

11        Plaintiffs argue that the National Labor Relations Act ("NLRA") allows the NLRB to

12  improperly exercise "executive authority", "judicial authority", "and/or" "legislative authority"

13  and that this violates Plaintiffs' due-process rights. All of the courts of appeal that have heard

14  this argument have rejected it, based on controlling Supreme Court precedent. *See, e.g.*,

15  *Flamingo Hilton-Laughlin v. NLRB*., 148 F.3d 1166, 1174 (D.C. Cir. 1998) (finding *Withrow v.*

16  *Larkin*, 421 U.S. 35 (1975) "dispositive").

17        Finally, even if Plaintiffs were entitled to relief under traditional standards for injunctive

18  relief, the Court lacks the authority to enjoin the Board's proceedings under the Norris-

19  LaGuardia Act. *See VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 24-cv-02577-THM, 2024

20  WL 4817175, at *1 (D.D.C. Nov. 17, 2024).

21        Plaintiffs do not suffer irreparable harm by having to wait until the petition for review

22  stage to raise any Seventh Amendment claim, much less by being party to proceedings overseen

23  by officials that the President does not desire to remove. By contrast, if a preliminary injunction

24  issues, the Union and Station employees will be irreparably harmed by the delay in remedying

25  Plaintiffs' unfair labor practices and the harm that this delay will do to support for the Union.

26  **FACTUAL BACKGROUND**

27        The Union is a labor organization consisting of the Culinary Workers Union Local 226

28  and Bartenders Union Local 165. It is the charging party in the two NLRB complaints that

Plaintiffs seek to enjoin. In those complaints, the NLRB's General Counsel alleges a widespread pattern of lawbreaking, dating back years.

Starting in 2016, LJEB began seeking status as exclusive bargaining representative at Station properties through National Labor Relations Board ("NLRB") elections. It won an election at Boulder Station involving 577 workers on September 3, 2016 by 62% of voters, at Green Valley Ranch involving 833 workers on November 9, 2017 by 67% of voters, at the Palms involving 910 workers on April 28, 2018 by 84% of voters, at Sunset Station involving 588 workers on June 13, 2019 by 83% of voters, at Fiesta Rancho involving 195 workers on June 14, 2019 by 85% of voters, and at Fiesta Henderson involving 315 workers on September 13, 2019 by 57% of voters. Declaration of Kevin Kline Opp. Mot. Prelim. Inj. ¶ 3 (hereinafter "Kline Decl.").

In addition to these election wins, LJEB gained representational rights at Palace Station following an election involving 586 workers on October 16, 2016, which the union lost by three votes. Kline Decl. ¶ 4. Station recognized LJEB in March 2017 as part of settlement agreement with NLRB Region 28 resolving unfair labor practice charges. *Ibid.* Those charges stemmed from Station's announcement after the Boulder Station election that all Station workers would receive free employee healthcare and reduced cost family health care except those at Boulder Station, as well a "promise-of-benefits" campaign targeting Palace Station workers during the run-up to the election there. *Ibid.*

LJEB also gained representational rights at Red Rock Casino Resort following an election held on December 20, 2019, which the Union lost (1,337 eligible voters, 46% in favor of union). Kline Decl. ¶ 5. This again followed a "promise-of-benefits" campaign in which Station announced free family health care, a 401(k) designed to mimic the LJEB's pension plan, free on-site health clinics, and other benefits, while threatening union supporters. Station was ordered to bargain on an interim basis after this Court granted an injunction under 29 U.S.C. § 160(j). *See Overstreet v. NP Red Rock, LLC*, 2021 WL 3064120. The NLRB subsequently found violations of the Act and ordered Station to bargain with LJEB. *NP Red Rock LLC*, 373

NLRB No. 67, 2024 WL 3063775. That bargaining has not taken place because Station appealed the order.

LJEB's election wins and recognition at the Palace Station and Red Rock Casino have been undermined by Station's unfair labor practices. Since 2019, Station has wielded the promise and grant of better healthcare and retirement benefits as a weapon in order to avoid unionization and undermine the union after it had gained representation. Changing health care plans and pension benefits to try to match what LJEB-represented workers receive elsewhere sends the signal that unionization is unnecessary (and that the benefits will be withdrawn if unionization occurs). *See NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409 (1964) ("[e]mployees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged."). That was the point of Station's changes in its benefits. For example, after corporate leadership had approved spending millions of dollars on changing Station's benefits, Station's Vice President for Human Resources emailed a colleague: "You believe that???? The free health care and company paid 401(k) is going to devastate the union." *NP Red Rock LLC*, 373 NLRB No. 67, 2024 WL 3063775, at *2.  Kline Decl. ¶ 6.

Station combined this strategy with other unfair labor practices during the run-up to the Red Rock Casino election in December 2019, like discriminating against union supporters, threatening workers with job loss, and interrogating a union supporter. Kline Decl. ¶ 7.

The NLRB subsequently described Station's plan as "extensive coercive and unlawful misconduct [that] stemmed from a carefully crafted corporate strategy intentionally designed at every step to interfere with employees' free choice," stating:

> the centerpiece of the Respondent's unlawful campaign was its tri-part message promising and granting employees tremendous new benefits without the Union, threatening to withhold or withdraw these benefits if employees selected the Union, and implicitly threatening that selecting the Union could only lead to years of fruitless bargaining without any improvement to working conditions. This highly coercive combination of promises and threats was accompanied by a barrage of further unlawful conduct, including additional threats that selecting the Union would lead to withdrawal of "favors," "extras," or "help" that employees could otherwise expect from management, implicit threats of job loss related to strikes, and interrogation and discriminatory treatment of Union supporters.

4

*NP Red Rock LLC*, 373 NLRB No. 67, 2024 WL 3063775, at *7.

Station then unlawfully withdrew recognition from the Union at Boulder Station and Palace Station in August and September 2020, without an NLRB-led decertification election. For years after doing so, it continued to publicize that it had done so to workers at other properties, posting notices on bulletin boards. Kline Decl. ¶ 9.

The combined effect of Station's campaign of unfair labor practices was to dramatically reduce support for the Union at LJEB-represented properties. For example, at Boulder Station, in the four years after Station's benefits campaign and unlawful withdrawal of recognition from the Union, voluntary participation in the Union Leadership Committee, which is responsible for communicating with co-workers about union representation and actions, and for distributing material (such as flyers) to co-workers providing them with updates, fell from 48 regular members to fewer than 10. At Red Rock Casino, workers who had been wearing union buttons to demonstrate their support, including committee leaders stopped doing so, and workers at the casino stopped signing union authorization cards. Kline Decl. ¶ 10.

All told, LJEB successfully organized over 5,300 workers at eight casino properties over three years, winning elections by a combined average of 65%. But today, following Station's massive ULP campaign, only one of these remains unionized, and no collective bargaining agreement has ever been reached. Kline Decl. ¶ 11.

In a complaint referred to as "Citywide I" the NLRB's General Counsel alleges, among other things, that Plaintiffs used the COVID-19 pandemic in a scheme to rid themselves of union supporters through discriminatory layoffs, transfers, recalls, and other job actions. *See* Doc. 14, Ex. A. The General Counsel alleges that at the same time, Plaintiffs orchestrated decertification petitions at Boulder Station and Palace Station, and ultimately used those petitions as the basis to withdraw recognition from LJEB at those properties on August 5, 2020 and September 21, 2020.

After the COVID-19 pandemic began, in May 2020, Station announced without advance warning that it was laying off full-time employees and discharging part-time and on-call employees  at six casinos that it planned to reopen when the government permitted it to do so

Local Joint Executive Board's Opp. Br.                    Case No. 24-cv-01966-JCM-BNW

(Boulder Station, Palace Station, Green Valley Ranch, Red Rock Casino, Sunset Station and Santa Fe Station), and it was discharging all employees at four casinos that it was closing indefinitely (Palms, Fiesta Henderson, Fiesta Rancho, and Texas Station). Kline Decl. ¶ 13.

When recalling these workers, Station used so called "MUD" lists, created at each property by supervisors classifying employees as "M" for pro-management, "U" for pro-union, or "D" for do not know. Kline Decl. ¶ 14. Internal company documents show that Station used these designations to decide whom to rehire after the pandemic-closures were lifted, whom to transfer to open positions, and whom to blacklist. *Ibid.* Thus, for example, Station's COO wrote to casino general managers on June 13, 2020 requesting MUD lists from the four casinos that had closed indefinitely on May 1 as well as lists of hiring needs from the six that would stay open: "Please send Phil [Fortino] and I your MUD lists from [Fiesta Rancho], Texas [Station], [Fiesta Henderson] and Palms. Also, please resend your open positions requested sheets. Some were sent to me and some were sent to Phil. We need to make sure we both have the same version." *Ibid.* Other documents demonstrate that managers made recommendations with respect to the rehiring of specific employees based on their "MUD" status. *Ibid.* For example, one manager stated that "[l]ooking at the MUD list we have 13 [Guest Room Attendants] we would bring back, the remaining we would prefer external." *Ibid.*

In a complaint referred to as "Citywide II", the NLRB General Counsel alleges that Plaintiffs committed numerous additional unfair labor practices, including discriminatorily firing workers for their union support and engaging in mass hiring to avoid a Nevada law requiring the recall of workers laid off due to the COVID-19 pandemic, in retaliation for those workers' advocacy for that law. *See* Doc. 14, Ex. B.

The delays inherent in the NLRB litigation process and the scale of Plaintiffs' alleged violations have allowed Plaintiffs to thwart their employees' free choice on unionization. Further delays in remedying Plaintiffs' unfair labor practices—including reinstating workers who were unlawfully discharged and recalling workers who supported the union before being displaced by the pandemic—will undermine support for the Union and increase workers'

cynicism that supporting the Union will bring about any material benefit in their lives. Kline Decl. ¶¶ 16–17.

ARGUMENT

**I.      Plaintiffs Are Unlikely to Succeed on Their Constitutional Claims.**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Na. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs' motion fails the "threshold inquiry" that is "the most important factor." They have no likelihood of success on the merits. *See Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020).

Courts around the country (including the other district court in the Ninth Circuit to hear such challenges) have rejected requests for preliminary injunctive relief based on theories identical to Plaintiffs'. *VHS Acquisition*, 2024 WL 4817175, at *1; *Alivio Medical Center v. Abruzzo*, No. 24-cv-7217, 2024 WL 4188068 (N.D. Ill. Sept. 13, 2024); *YAPP USA Auto Sys., Inc. v. NLRB*, No. 24-cv-12173, 2024 WL 4119058 (E.D. Mich. 2024), *denying injunction pending appeal,* No. 24-1754, 2024 WL 4489598, at *3 (6th Cir. Oct. 13, 2024), *writ of injunction denied* No. 24A348, 2024 WL 4508993 (S. Ct. Oct. 15, 2024) (Kavanaugh, J.); *Ares Collective Group LLC v. NLRB*, No. 24-cv-00517, 2024 WL 4581436 (D. Ariz. Oct. 25, 2024); *HonorHealth v. NLRB*, No. 24-cv-03009-PHX-DJH, 2024 WL 4769772, at *1 (D. Ariz. Nov. 13, 2024); *Nexstar Media, Inc. v. NLRB*, No. 24-cv-01415, 2024 WL 4127090 (N.D. Ohio Aug. 26, 2024); *Spring Creek Rehab. & Nursing Center LLC v. NLRB*, No. 24-cv-09016, 2024 WL 4563789 (D. N.J. Oct. 24, 2024); *Care One LLC. v. NLRB*, 680 F.Supp.3d 540 (D. N.J. 2023); *Loren Cook Company v. NLRB*, No. 24-cv-03277-BCW, 2024 WL 5004534, at *1 (W.D. Mo. Nov. 27, 2024); *see also Overstreet v. Lucid USA Inc.*, No. 24-cv-01356-PHX-DJH, 2024 WL 5200484 (D. Ariz. Dec. 23, 2024) (denying motion to dismiss NLRB Regional Director's request for injunction under 29 U.S.C. §160(j)).[1]

---

[1] The exception to this national trend is three district courts in Texas, which relied on an erroneous interpretation of *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) to grant injunctive relief. *See Space Expl. Technolo-Gies Corp. v. NLRB*, No. 24-cv-00203-ADA, 2024 WL 3512082 (W.D. Tex. July 23,

7

1    **A.  Plaintiffs' removal-power claim is untenable.**

2        1.  **Plaintiffs face no constitutional harm because the President has expressed**
3            **no desire to remove the relevant officers.**

4        Article II, Section 1 of the Constitution vests the President with "[t]he executive power,"

5    and with the duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 1,

6    cl. 1; *id.* at § 3. Although "[t]he entire 'executive Power' belongs to the President alone," *Seila*

7    *Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 213 (2020), "[p]ractically,

8    however, the President must depend on an array of executive agencies for assistance in

9    exercising that power." *Kaufmann v. Kijazaki*, 32 F.4th 843, 847 (9th Cir. 2022) (citing *Seila*

10   *Law*, 591 U.S. at 213–14). To protect the President's executive power, the Supreme Court has

11   "adhered to the general rule that the President possesses 'the authority to remove those who

12   assist him in carrying out his duties.'" *Seila Law*, 591 U.S. at 215 (quoting *Free Enterprise*

13   *Fund v. Pub. Co. Acc. Oversight Bd.*, 561 U.S. 477, 513–14 (2010)). Plaintiffs argue that NLRB

14   administrative law judges ("ALJs") and Board members are "officers" under the Appointments

15   Clause and that the removal protections they enjoy make the NLRB's structure unconstitutional

16   and entitle Plaintiffs to an injunction. Doc. 13, at 7–8.

17       But a claim that administrative officers are subject to removal protections that violate

18   Article II is fundamentally different from a claim that those officers' *appointment* was

19   unconstitutional. *Collins*, 594 U.S. at 257–58. In the case of an officer unconstitutionally

20   appointed, the officer's acts are *void ab initio*. *Ibid.*; *see, e.g., Lucia v. Sec. & Exch. Comm'n*,

21   585 U.S. 237, 251 (2018) (adjudication by officer appointed in violation of the Appointments

22   Clause was "tainted"). But where the officers were "properly appointed[,]" as the NLRB

23   members and ALJs admittedly were here, they "possess the authority to carry out the functions

24   of the[ir] office." *Collins*, 594 U.S. at 257-58. The "unlawfulness of [a] removal provision does

25   not strip [an inferior officer] of the power to undertake the . . . responsibilities of his office." *Id.*

26

27   2024); *Seton v. NLRB*, No. 24-cv-01176-ADA, 2024 WL 4678057 (W.D. Tex. Oct. 18, 2024); *Energy*
     *Transfer, LP v. NLRB*, No. 24-cv-198, 2024 WL 3571494 (S.D. Tex. July 29, 2024); *Aunt Bertha v.*
28   *NLRB*, No. 24-cv-00798, 2024 WL 4202383, at *1 (N.D. Tex. Sept. 16, 2024). Several of those
     decisions are on appeal to the Fifth Circuit.

Local Joint Executive Board's Opp. Br.                    Case No. 24-cv-01966-JCM-BNW

at 258 n.23; *id.* at 267 (Thomas, J., concurring) ("The mere existence of an unconstitutional removal provision . . . generally does not automatically taint Government action by an official unlawfully insulated."); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021).

Accordingly, Plaintiffs are required to do more than simply argue that they are threatened with being party to proceedings overseen by officials unconstitutionally shielded from presidential removal. They are required to show that the removal restriction has caused them *actual, compensable harm* in their particular case, by demonstrating, for example, that "the President had attempted to remove [an officer] but was prevented from doing so" or "had made a public statement expressing displeasure with the officer's actions" and "that he would remove the [officer] if the statute did not stand in the way." *Collins*, 594 U.S. at 259-60; *Decker*, 8 F.4th at 1137 (plaintiff challenging unconstitutionality of removal provisions is required to "demonstrate that the unconstitutional provision actually caused the plaintiff harm"); *CFPB v. CashCall, Inc*., 35 F.4th 734, 742-43 (9th Cir. 2022); *Leachco, Inc. v. Consumer Product Safety Comm'n*, 103 F.4th 748, 756 (10th Cir. 2024); *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*, 51 F.4th 616, 632 (5th Cir. 2022), *rev'd on other grounds*, 601 U.S. 416 (2024) (plaintiffs in removal power cases must meet "three requisites for proving harm: (1) A substantiated desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions taken by the insulated actor.").

Although some post-*Collins* litigants have attempted to argue that the requirement of compensable harm only applies in cases seeking a retroactive remedy, the circuit courts that have heard this argument have recognized that the same showing is required for prospective relief. *Leachco*, 103 F.4th at 757; *CFPB v. Law Offices of Crystal Moroney P.C.*, 63 F.4th 174, 180–81 (2d Cir. 2023); *Calcutt v. Fed. Deposit Ins. Corp*., 37 F.4th 293, 316 (6th Cir. 2022), *rev'd on other grounds*, 598 U.S. 623 (2023).

Plaintiffs do not attempt to make a showing that they are harmed by any infirmity in the removal protections for NLRB members or ALJs, nor could they. There is no evidence that the President has any desire to remove Board members or the ALJ assigned to this case, or that he

9

is even aware of this case. *See Kaufmann*, 32 F.4th at 850; *Collins*, 594 U.S. at 275 (Kagan, J.,

concurring) ("When an agency decision would not capture a President's attention, his removal

authority could not make a difference—and so no injunction should issue.").

## 2. *Axon Entertainment Ltd. v. FTC* does not support Plaintiffs' claim.

Plaintiffs argue that the Supreme Court reversed *Collins sub silencio* in *Axon Enterprise,*

*Inc. v. FTC*, 598 U.S. 175 (2023). They claim that *Axon* established that "being forced to

proceed . . . in an unconstitutionally structured process" is a "here-and-now injury" that entitles

them to an injunction. Doc. 13, at 32.

But *Axon* dealt only with the threshold *jurisdictional* question of whether a plaintiff

must raise its removal-protections claim via post-enforcement statutory review procedures,

under the test set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). The Court did

not address the merits of the plaintiff's claims. *Axon*, 598 U.S. at 180 ("Our task today is not to

resolve those challenges; rather it is to decide where they may be heard."). The Court in *Axon*

was solely addressing the question of whether the district court had subject-matter jurisdiction

over the plaintiff's removal-protection challenge. *Leachco*, 103 F.4th at 758 ("The Court in

*Axon* only addressed whether the petitioners, who were respondents in administrative

enforcement actions before the SEC and FTC, could initially bring collateral challenges in

federal court to the constitutionality of those agencies' structure" and thus "does not help

*Leachco* establish irreparable harm."); *YAPP USA Automotive Systems, Inc. v. NLRB*, No. 24-

1754, 2024 WL 4489598, at *3 (6th Cir. Oct. 13, 2024) (denying motion for preliminary

injunction based on *Axon* because "[t]he Court did not address the merits of those claims, but

rather assessed whether federal courts have *jurisdiction* to hear the claims on their merits.").

If Plaintiffs were correct and *Axon* means that merely being subjected to proceedings

overseen by officials with unconstitutional removal protections is remediable harm, then *Collins*

was incorrectly decided. The plaintiffs in that case had been subjected to such proceedings, but

the Court required a demonstration that the unconstitutional removal protection had actually

affected the hearings. *Axon* did not even mention *Collins*. It did not overrule the earlier case.

*Spring Creek Rehab. & Nursing Ctr. LLC v. NLRB*, No. CV 24-09016, 2024 WL 4563789, at *4

10

(D.N.J. Oct. 24, 2024) ("Put simply, the *Axon* Court determined where and when a plaintiff may challenge removal protections, but it did not modify what a plaintiff needs to prove to demonstrate that the proceeding and decisionmakers it faces are illegitimate, nor did it overrule *Collins v. Yellen*, 594 U.S. 220 (2021) without indicating as much.").

Moreover, *Axon*'s concern for the jurisdictional, "here-and-now" injury of being subject to administrative proceedings before officers unconstitutionally protected from removal came from *Seila Law*, 591 U.S. at 210–11, which recognized that the petitioners had *standing* based on their claim to be harmed by an administrative proceeding overseen by officers they argued enjoyed unconstitutional removal protections. In *Collins*, however, the Court expressly recognized that this holding did not obviate the need to determine whether the allegedly unconstitutional removal protection caused actual harm. 594 U.S. at 258 n.24 ("What we said about standing in *Seila Law* should not be misunderstood as a holding on a party's entitlement to relief on an unconstitutional removal restriction. . . . [T]hat holding on standing does not mean that actions taken by such an officer are *void ab initio* and must be undone."); *Leachco*, 103 F.4th at 759.

### 3.  The remedy that Plaintiffs seek is illogical.

Even if Plaintiffs were correct that the mere existence of putatively unconstitutional removal protections constituted an injury going to the merits, the injunction that they seek makes little sense. Plaintiffs seek to enjoin the NLRB's proceedings entirely, based on the mere possibility that sometime in the future, the President may conclude that his removal power is being unconstitutionally impeded.  Even if Plaintiffs' Article II theory were correct, the most that they could be entitled to would be declaratory relief requiring that NLRB members and ALJs respect the President's future attempt to remove them (statutory protections notwithstanding).

The Fifth Circuit has held that "[i]n a suit seeking to vindicate the President's removal power," a plaintiff with a meritorious claim may at most be "entitled to declaratory relief sufficient to ensure that the . . . requirements and . . . standards to which [it is] subject will be enforced only by a constitutional agency accountable to the Executive.'" *Consumers' Rsch. v.*

1    *CPSC*, 91 F.4th 342, 351 (5th Cir. 2024) (citing *Free Enter. Fund v. PCAOB*, 561 U.S. 477

2    (2010)).

3           Even this conclusion is questionable, however, because such declaratory relief in a

4    proceeding collateral to any actual controversy about the President's removal power is entirely

5    unnecessary. As Justice Thomas explained in *Collins*:

6           That the Constitution automatically trumps an inconsistent statute creates a paradox for
            the shareholders. Had the removal restriction *not* conflicted with the Constitution, the
7           law would never have unconstitutionally insulated any Director. And while the
            provision *does* conflict with the Constitution, the Constitution has always displaced it
8           and the President has always had the power to fire the Director for any reason. So
            regardless of whether the removal restriction was lawful or not, the President always had
9           the legal power to remove the Director in a manner consistent with the Constitution.

10

11   594 U.S. at 267 (Thomas, J., concurring). If the President does have the power to remove NLRB

12   members and ALJs at will, then that right exists regardless of any statutory impediment. This

13   Court's declaration of the President's rights is unnecessary.

14          Accepting Plaintiffs' removal-power theory on the merits would require the Court to

15   disregard Supreme Court and Ninth Circuit precedent. *Decker*, 8 F.4th at 1130 (two-layer

16   removal protections for Department of Labor ALJs is constitutional); *Humphrey's Executor v.*

17   *United States*, 295 U.S. 602, 619–20 (1935); *Overstreet v. Lucid USA Inc.*, 2024 WL 5200484,

18   at *7 (rejecting theories identical to Plaintiffs' and holding that "[l]ike the DOL's ALJs in

19   *Decker Coal*, the NLRB's ALJs removal protections in 5 U.S.C. § 7521 do not improperly

20   insulate them from removal" and "that the removal protections of the NLRB's Board Members

21   fall within the board member exception set out in *Humphrey's Executor*"). But the claim cannot

22   support a preliminary injunction in any case because Plaintiffs cannot demonstrate any

23   cognizable harm.

24          **B.  Plaintiffs cannot succeed on their Seventh Amendment claim.**

25                **1.  Plaintiffs raise a statutory claim, not a constitutional one.**

26          Plaintiffs argue that future remedies that an ALJ may award (and the NLRB may ratify)

27   are subject to the Seventh Amendment, and that Board proceedings should be enjoined because

28   the ALJ has not empaneled a jury. Doc. 13, at 29–32.

12

Local Joint Executive Board's Opp. Br.                    Case No. 24-cv-01966-JCM-BNW

1      But Plaintiffs' complaint and motion make clear that they are raising a *statutory*

2  argument in the first instance, not a constitutional one. Plaintiffs recognize that the NLRA limits

3  the Board's remedies to "'an order requiring [the] Board to remedy unfair labor practices, and to

4  take . . . affirmative action including reinstatement of employees with or without back pay.'"

5  Doc. 1 ¶ 39 (quoting 29 U.S.C. § 160(c)). But they argue that "despite" this remedial authority,

6  the NLRB has "announced the Board's intention to assert much broader authority to order

7  awards of future monetary and other legal and equitable remedies, including relief that is

8  legal/compensatory and/or punitive in nature." *Ibid*. Plaintiffs argue that this "dramatic

9  expansion of remedial authority is . . . not countenanced by the relevant statutory provision."

10  Doc. 13, at 3 & n.4.

11      This amounts to nothing more than a premature claim that the Board *may* exceed the

12  remedial powers afforded it by *statute*. This Court lacks jurisdiction to entertain such a claim,

13  and it is plainly unripe.

14      The Seventh Amendment "extends to a particular statutory claim [only] if the claim is

15  legal in nature," and does not extend to "suits which are [] of equity or admiralty jurisdiction."

16  *SEC v. Jarkesy*, 144 S. Ct. 2117, 2128 (2024). The Supreme Court has already held that the

17  Board's remedies are equitable and beyond the reach of the Seventh Amendment. *See Jones &*

18  *Laughlin*, 301 U.S. at 48 (rejecting argument that back-pay was "equivalent to a money

19  judgment and hence contravenes the Seventh Amendment" because the jury trial right does not

20  apply "to cases where recovery of money damages is an incident to equitable relief"). The

21  Supreme Court has often described the Board's remedial authority in equitable terms. *See, e.g.,*

22  *Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 236 (1938) ("The power to

23  command affirmative action is remedial, not punitive, and is to be exercised in aid of the

24  Board's authority to restrain violations and as a means of removing or avoiding the

25  consequences of violation where those consequences are of a kind to thwart the purposes of the

26  Act"); *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 12–13 (1940).

27      In *SEC v. Jarkesy*, the Supreme Court addressed whether an SEC proceeding seeking

28  civil penalties for alleged securities fraud violated the Seventh Amendment. *Jarkesy*, 144 S. Ct.

at 2124–25. The Court found that the particular nature of the proceeding—which involved a securities fraud allegation derived from the common law and civil penalties explicitly designed to deter future wrongdoing—made the administrative action legal in nature and entitled Jarkesy to a jury trial. *Id*. at 2128–31.

The challenge to the SEC's enforcement scheme in *Jarkesy* stands in marked contrast to Plaintiffs' argument here. In addition to other remedies, the SEC is expressly empowered by statute to assess civil penalties that range up to $725,000 in its administrative proceedings. *See* 15 U.S.C. §§ 77h-1(g), 78u-2(b), 80b-3(i). There was no allegation that the SEC had overstepped the bounds of its Congressionally granted authority; the sole question was whether it could exercise this unquestioned statutory power consistent with the Seventh Amendment. The constitutional issue was squarely presented and unavoidable.

By contrast, Plaintiffs here raise the predicate contention that the remedies the General Counsel seeks are beyond the NLRB's statutory authority. Resolution of that issue will almost certainly obviate the need to address the Seventh Amendment question. If Plaintiffs are correct and any remedies that the NLRB ultimately imposes in this case are beyond its statutory authority, then the Seventh Amendment claim will be moot. If the remedies are within the NLRB's statutory authority, because they involve make-whole money damages imposed as "an incident to equitable relief" then they will not violate the Seventh Amendment. *Jones & Laughlin*, 301 U.S. at 48.

Even if there were some question as to whether resolution of Plaintiffs' statutory argument would avoid the need to address the constitutional question, reaching out to address the constitutional issue *at this stage* would be inappropriate. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944); *United States v. Kaluna*, 192 F.3d 1188, 1197 (9th Cir. 1999) (*en banc*) ("Prior to reaching any constitutional questions, federal courts must consider non-constitutional grounds for decision. This is a fundamental rule of judicial restraint.") (quoting *Jean v. Nelson*, 472 U.S. 846, 854 (1985)) (quotations omitted).

Adjudicating Plaintiffs' constitutional claims before the General Counsel has concretely sought, or the NLRB has imposed, *any* remedies would amount to an advisory opinion. *Carney v. Adams*, 592 U.S. 53, 58 (2020); *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 345–46 (1936) (Brandeis, J., concurring) ("The Court has frequently called attention to the 'great gravity and delicacy' of its function in passing upon the validity of an act of Congress; and has restricted exercise of this function by rigid insistence that the jurisdiction of federal courts is limited to actual cases and controversies; and that they have no power to give advisory opinions.").

**2. Plaintiffs' challenge to the NLRB's remedial authority must be brought through the NLRA's judicial-review procedures.**

This Court lacks jurisdiction to address Plaintiffs' challenge to remedies that the NLRB may impose in this case. Congress granted the NLRB exclusive jurisdiction over unfair labor proceedings and channeled all judicial review to the courts of appeals. *See* 29 U.S.C. §§ 160(e)–(f). As a general rule, Congress's provision for "review in a court of appeals following the agency's own review process . . . divests district courts of their ordinary jurisdiction over the covered cases." *Axon*, 598 U.S. at 185.

To bring this claim in district court, Plaintiffs must establish an exception to this general rule. Such exceptions are defined by *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), where the Supreme Court identified three relevant factors: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral" to the agency's review procedures; and (3) whether the claim is "outside the agency's expertise." *Id.* at 212–13.

Plaintiffs cannot establish district-court jurisdiction because their "statutory and constitutional claims here can be meaningfully addressed in the Court of Appeals." *Id.* at 215. To determine whether a litigant can receive meaningful judicial review in the courts of appeals following an agency proceeding, the Supreme Court analyzes the nature of the injury alleged. "The interaction between the alleged injury and the timing of review" is key: only where the claim alleges that the plaintiff is being subjected to an illegitimate "decisionmaking process . . .

15

irrespective of its outcome, or of other decisions made within it," such that the plaintiff "would have the same claim had it *won* before the agency," is district-court jurisdiction appropriate. *Axon*, 598 U.S. at 192.

That is not the case here. Plaintiffs' Seventh Amendment claim does not challenge the NLRB proceedings as a whole, only certain remedies that may be imposed in it. Its challenge to those remedies will not arise if it wins before the NLRB. Plaintiffs will have no Seventh Amendment claim at all if: (1) the company is not found liable; (2) the ALJ does not recommend and/or the Board does not assess the purportedly legal remedies; or (3) the specific remedies eventually awarded are ultimately deemed to be equitable. Unlike a litigant who challenges "subjection to [agency] process regardless of its outcome, or of other decisions made within it," *Axon*, 598 U.S. at 192, Plaintiffs' claimed Seventh Amendment injury is entirely dependent on the proceedings' outcome and the remedial "decisions made within it." *See also YAPP USA Auto. Sys., Inc. v. NLRB*, No. 24-12173, 2024 WL 4119058, at *11 (E.D. Mich. Sept. 9, 2024) ("YAPP's Seventh Amendment claim is a challenge to the remedies being sought in the administrative proceeding. It is not, as the NLRB points out, 'a "structural" challenge attacking the very nature of the agency.'"); *VHS Acquisition*, 2024 WL 4817175, at *6-9 (Seventh Amendment claims did not meet *Thunder Basin* factors).[2]

**3. Plaintiffs' Seventh Amendment claim is not ripe.**

Even if the Court had jurisdiction to adjudicate it, Plaintiffs' Seventh Amendment claim is not ripe. At this juncture, it is impossible to know whether the ALJ will recommend or the Board will order *any* remedy that Plaintiffs object to. Indeed, this question *first* turns on a liability finding that is either voluntarily complied with or is enforced by a court of appeals, *see*

---

[2] While the first *Thunder Basin* factor is dispositive, Plaintiffs cannot establish the other two factors either. A "collateral" claim arises when a litigant "object[s] to [an agency's] power generally, not to anything particular about how that power was wielded" in a particular enforcement action or any particular "actions taken in the agency proceedings." *Axon*, 598 U.S. at 192–93. That is not the case here. And the Board has expertise in defining the appropriate relief to remedy unfair labor practices. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941) (rather than defining "the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations," Congress intended to "leave[] the adaption of means to end to the empiric process of administration . . . committed to the Board, subject to limited judicial review").

Local Joint Executive Board's Opp. Br.                    Case No. 24-cv-01966-JCM-BNW

29 U.S.C. §§ 160(e)–(f), and *second* turns on what, if any, evidence can be introduced to prove any direct or foreseeable pecuniary harm, which takes place at a subsequent compliance proceeding that follows the liability finding, *see* 29 C.F.R. § 101.16; *Thryv, Inc.*, 372 NLRB No. 22, at *14 (Dec. 13, 2022), *vacated in part by Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024); *E.I. du Pont de Nemours & Co. v. NLRB*, 489 F.3d 1310, 1317 (D.C. Cir. 2007) (Kavanaugh, J.) ("[I]f the Board reserves the [remedy] issue for later consideration," the court's opportunity to review the remedy "will necessarily be deferred until the Board resolves the issue in a subsequent order") (cleaned up). Plaintiffs' claim therefore rests on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 580–81 (1985).

### 4.  In any case, Plaintiffs' Seventh Amendment claim is meritless.

The Supreme Court rejected a Seventh Amendment challenge to the NLRB's administrative remedial process in *Jones & Laughlin*, 301 U.S. 1. The Supreme Court's decision rested on two foundations. First, the Court recognized that the unfair labor practice charge before it was "not a suit at common law or in the nature of such a suit." *Id*. at 48. Unfair labor practice charges "safeguard the right of employees to self-organization and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint or coercion by their employer," rights that did not exist at common law. *Id*. at 33, 48. Moreover, the monetary remedies available in NLRB proceedings are purely remedial and incident to equitable relief. *Id*. at 48 (the Seventh Amendment "has no application to cases where recovery of monetary damages is an incident to equitable relief").

Second, *Jones & Laughlin* held that because the action in question "is a statutory proceeding," it was not one to which the Seventh Amendment applied. 301 U.S. at 48. This aspect of the decision came to be known as the "public rights" exception to the Seventh Amendment, which "stands for the proposition that the Seventh Amendment is generally inapplicable in administrative proceedings, where jury trials would be incompatible with the whole concept of administrative adjudication and would substantially interfere with the NLRB's role in the statutory scheme." *Curtis v. Loether*, 415 U.S. 189, 194 (1974); *see also Atlas*

*Roofing Co. v. OSHRC*, 430 U.S. 442, 455 (1977) ("[W]hen Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.'").

*Jarkesy* did not overturn either of these distinct bases on which *Jones & Laughlin* concluded that no jury trial is required in Board proceedings, even indirectly. *See Jarkesy*, 144 S. Ct. at 2136–37 (Court "need not reach" question of whether *Atlas Roofing* should be overturned, "[b]ecause the public rights exception as construed in *Atlas Roofing* does not extend to these civil penalty suits for fraud, that case does not control."). *Jones & Laughlin* and nearly a century of law since then remain good law, which the Court is obligated to follow. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).

### C.  Plaintiffs Separation-of-Powers Argument Cannot Prevail.

Plaintiffs allege a violation of the separation of powers and a deprivation of due process because the NLRB purportedly has legislative, executive, and judicial functions. Doc. 13, at 8–9. The only alleged executive function that Plaintiffs cite is the Board's role in approving initiation of injunction proceedings under NLRA § 10(j), 29 U.S.C. § 160(j). *Id*. at 8. The alleged legislative function is "rule-making and other legislative functions" under 29 U.S.C. § 156. *Id*. at 9.

Plaintiffs do not provide any authority for the notion that the NLRB's combined ability to interpret the NLRA through adjudication or promulgating regulations violates the Fifth Amendment, devoting only a short paragraph to the notion. *See* Doc. 13, at 28. Nor do they explain how they are harmed by the combination of these functions. "Under most regulatory schemes, rulemaking, enforcement, and adjudicative powers are combined in a single administrative authority." *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 151 (1991). Since the identifying badge of modern administrative agencies is Congress's delegation of both rulemaking and adjudicative processes, Plaintiffs' legal theory would deregulate much of the economy. *See Humphrey's Executor,* 295 U.S. at 627 (approving

Local Joint Executive Board's Opp. Br.                    Case No. 24-cv-01966-JCM-BNW

creation of an executive agency to "perform . . . duties as a legislative or as a judicial aid" that is, to "act in part quasi-legislatively and in part quasi-judicially").

Plaintiffs' due-process claim based on the NLRB's mixing of prosecutorial and adjudicatory authority has been specifically rejected by four courts of appeals. *See Flamingo Hilton-Laughlin*, 148 F.3d at 1174; *Kessel Food Mkts., Inc. v. NLRB*, 868 F.2d 881, 887–88 (6th Cir. 1989); *NLRB v. Sanford Home for Adults*, 669 F.2d 35, 37 (2d Cir. 1981); *Eisenberg v. Holland Rantos Co.*, 583 F.2d 100, 104 n.8 (3d Cir. 1978). The claim is foreclosed by the Supreme Court's decision in *Withrow v. Larkin*, 421 U.S. 35 (1975). *See Flamingo Hilton-Laughlin*, 148 F.3d at 1174; *Kessel*, 868 F.2d at 888 (*Withrow* "dispositive"). Similarly, the Ninth Circuit has rejected the argument that NLRB Regional Directors' prosecutorial authority to issue complaints in unfair labor practice cases and adjudicative authority to order the taking of depositions in such cases violates due process. *NLRB v. Aaron Bros. Corp.*, 563 F.2d 409, 413 (9th Cir. 1977) (holding that after *Withrow v. Larkin*, such as claim is "not well founded").

In *Withrow*, a unanimous Court held that vesting a state medical board with authority both to investigate and to suspend a doctor's medical license was consistent with due process. 421 U.S. at 47. The Court made clear that there is no "broad rule that the members of an administrative agency may not investigate the facts, institute proceedings, and then make the necessary adjudications." *Id*. at 53. After all, as the Court explained:

> Judges repeatedly issue arrest warrants on the basis that there is probable cause to believe that a crime has been committed and that the person named in the warrant has committed it. Judges also preside at preliminary hearings where they must decide whether the evidence is sufficient to hold a defendant for trial. Neither of these pretrial involvements has been thought to raise any constitutional barrier against the judge's presiding over the criminal trial and, if the trial is without a jury, against making the necessary determination of guilt or innocence. Nor has it been thought that a judge is disqualified from presiding over injunction proceedings because he has initially assessed the facts in issuing or denying a temporary restraining order or a preliminary injunction.

*Id*. at 56. The Supreme Court then specifically rejected the idea that combining prosecutorial and adjudicative functions in an administrative agency violates due process:

> It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting

19

enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not . . . violate due process of law.

*Ibid*.

Plaintiffs argue that *Withrow* does not apply when "the same person performs" both prosecutorial and adjudicative functions. Doc. 13, at 25 (citing *Walker v. City of Berkeley*, 951 F.2d 182, 185 (9th Cir. 1991)). But in *Walker*, the City of Berkeley caused a staff attorney to function both as city's *attorney* in a discharged city employee's federal court case and as decision maker in that employee's post-termination hearing. That does not describe a Board member's role in § 10(j) proceedings.

The Taft–Hartley Act gave the NLRB the ability to petition a district court for injunctive relief pending administrative review of unfair labor practice charges. Section 10(j) states that the "Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court . . . for appropriate temporary relief." 29 U.S.C. § 160(j). Although § 10(j) grants this power to "the Board," the Taft-Hartley Act also states that the General Counsel has "final authority,  on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, *and shall have such other duties as the Board may prescribe* or as may be provided by law." 29 U.S.C. § 153(d) (emphasis added).

Immediately following the passage of the Taft-Hartley Act, the Board and the General Counsel entered into a "memorandum of understanding" under which the General Counsel had complete authority to initiate and prosecute injunctions pursuant to § 10(j). *See Evans v. Int'l Typographical Union,* 76 F. Supp. 881, 888 (S.D. Ind. 1948). This practice lasted until 1950, when the Board published a regulation explaining that the General Counsel had to seek Board approval before initiating injunctions under § 10(j). NLRB, General Counsel—Description of Authority and Assignment of Responsibilities, 15 Fed. Reg. 6924 (Oct. 14, 1950). Since 1950, the Board's only role has been to approve requests by the General Counsel (through Regional Directors) for authority to seek § 10(j) relief, delegating the prosecutorial function of initiating §

20

10(j) proceedings in federal court to the General Counsel. *See Frankl v. HTH Corp.*, 650 F.3d 1334, 1344 (9th Cir. 2011). Neither the NLRB as a whole nor any Board member prosecutes § 10(j) injunction actions or represents the Board in such proceedings, so *Walker v. City of Berkeley* does not apply.

Even if *Walker* did apply, Plaintiffs identify the "same person" who authorized earlier § 10(j) proceedings against Plaintiffs campaign of unfair labor practices as former NLRB Member Laura McFerran, stating that she is "highly unlikely to decline to adjudicate the merits of the Citywide I and Citywide II matters if still a member of the Board." Doc. 13, at 26. The problem with that argument is that McFerran is no longer a Board member, as her term ended on December 16, 2024 and the Senate declined to reappoint her, so she will not adjudicate either complaint.[3]

## II.    The Balance of Harms Clearly Weighs Against an Injunction.

Plaintiffs base their claim to irreparable harm almost entirely on a misreading of *Axon Enterprises*, arguing that the "here-and-now" injury that supported district-court jurisdiction in that case supports the grant of a preliminary injunction. Courts have overwhelmingly rejected this contention. *Compare* Doc. 13, at 32–34 *with Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024) ("In finding Axon's claims within the district court's ordinary jurisdiction, the Court did not speak to what constitutes irreparable harm for purposes of the extraordinary remedy of a preliminary injunction. . . .  Instead, the question before us, which was not answered in *Axon*, is whether the injury Alpine claims is so great that it necessitates 'accelerated and unorthodox' summary review of the merits without a developed factual record."); *Leachco*, 103 F.4th at 758 ("*Axon* does not help Leachco establish irreparable harm because *Axon* did not address the issue of irreparable harm, or any other issue regarding entitlement to injunctive relief."); *Ares Collective*, 2024 WL 4581436, at *2.[4]

---

[3] Daniel Wiessner, "US Senate rejects Biden labor board nominee, teeing up Republican control," Reuters (Dec. 12, 2024), https://www.reuters.com/world/us/us-senate-rejects-biden-labor-board-nominee-teeing-up-republican-control-2024-12-11/.

[4] Plaintiffs' claim that in the Ninth Circuit, threats of alleged constitutional harm are always sufficient to establish irreparable harm is misplaced. *See* Doc. 13, at 34. The cases Plaintiffs cite all involve *personal* constitutional deprivations, not abstract removal-power or separation-of-powers challenges. *See Baird v.*

1    By contrast, as the Ninth Circuit has held, delay works an irreparable harm on union

2 organizing, because "'[a]s time passes, the benefits of unionization are lost and the spark to

3 organize is extinguished.'" *Frankl v. HTH Corp.*, 650 F.3d 1334, 1362–63 (9th Cir. 2011)

4 (quoting *NLRB v. Electro–Voice, Inc.,* 83 F.3d 1559, 1573 (7th Cir. 1996)). Consequently, even

5 if the Board subsequently orders a remedy, "the union is likely weakened in the interim, and it

6 will be difficult to recreate the original status quo with the same relative position of the

7 bargaining parties. That difficulty will increase as time goes on." *Frankl*, 650 F.3d at 1163.

8    In a similar vein, "'the discharge of active and open union supporters risks a serious

9 adverse impact on employee interest in unionization and can create irreparable harm to the

10 collective bargaining process.'" *Frankl*, 650 F.3d at 1363 (quoting *Pye v. Excel Case Ready*,

11 238 F.3d 69, 74 (1st Cir. 2001)) (internal quotation marks omitted); *see also Schaub v. W.*

12 *Michigan Plumbing & Heating, Inc.*, 250 F.3d 962, 971 (6th Cir. 2001) (without reinstatement

13 of discriminatee, "there would be no one at the company organizing for the union"); *Electro-*

14 *Voice*, 83 F.3d at 1573 (noting that the discharged organizers' "absence deprives the employees

15 of the leadership they once enjoyed"); *Overstreet v. Lucid USA Inc.*, No. 24-cv-01356-PHX-

16 DJH, 2024 WL 4186825, at *15 (D. Ariz. Sept. 13, 2024) ("The fears expressed by

17 Respondent's employees that they will be discharged or mistreated if they continue to support

18 the union justify a finding of irreparable harm.").

19    Plaintiffs' violations fit this bill. Plaintiffs' unfair labor practices date back to 2019. It

20 has taken five years for the NLRB and its General Counsel to investigate the charges, bring a

21 complaint, and commence administrative hearings. *See generally* Doc. 14, Exs. A, B.

22 Preliminarily enjoining the NLRB's proceedings, and further delaying remedies for these unfair

23

24 ─────────────────────
*Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (Second Amendment); *Riley's Am. Heritage Farms v.*
25 *Elsasser*, 32 F.4th 707, 716 (9th Cir. 2022) (First Amendment); *Roman v. Wolf*, 977 F.3d 935 (9th Cir.
2020) (allegation that conditions of prison confinement violated due process); *cf. CFPB v. Future*
26 *Income Payments, LLC*, No. 8:17-CV-00303-JLS-SS, 2017 WL 5635401, at *2 (C.D. Cal. May 23,
2017) (rejecting argument that "'having to participate in a government investigation that the company
27 believes to transgress separation-of-powers principles constitutes irreparable harm'"); *John Doe Co. v.*
*Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1135 (D.C. Cir. 2017) ("In the absence of 'immediate or
28 ongoing harm stemming from the [Bureau's] alleged constitutional defects,' the 'violation of separation
of powers' by itself is not invariably an irreparable injury.").

Local Joint Executive Board's Opp. Br.                    Case No. 24-cv-01966-JCM-BNW

1  labor practices, would cause the Union and Station employees who support forming a union,

2  irreparable harm. Kline Decl., ¶¶16-17.

3  **III.    This Court Lacks Jurisdiction Under the Norris-LaGuardia Act.**

4          Even if Plaintiffs had been able to demonstrate entitlement to a preliminary injunction

5  under traditional standards, the Court would lack jurisdiction to enter one under the Norris-

6  LaGuardia Act, 29 U.S.C. § 101 *et seq*. *See VHS Acquisition*, 2024 WL 4817175, at *9–14.

7          Norris-LaGuardia makes clear that "[n]o court of the United States . . . shall have

8  jurisdiction to issue any . . . injunction in a case involving or growing out of a labor dispute,"

9  except in "strict conformity with the statute." 29 U.S.C. § 101. The present action "involve[es]

10  or grows out of a labor dispute," as defined by the Act. 29 U.S.C. § 101, 113(c); *VHS*

11  *Acquisition*, 2024 WL 4817175, at *10–11. An injunction here is not necessary to protect

12  against "substantial and irreparable injury to [Plaintiffs'] property." 29 USC § 107(b). Plaintiffs

13  do not allege any threat to their property, only the threat of purportedly unconstitutional

14  exercise of administrative authority and the potential unconstitutional award money damages.

15  They rely on the "here-and-now" injury in *Axon* as an exception to Norris-LaGuardia, Doc. 13,

16  at 14 n.21, but as explained, that case does not support an irreparable-injury claim (much less

17  one to "property." *VHS Acquisition*, 2024 WL 4817175, at *12–13. And this case does not fall

18  within the "narrow and specific" judicially created exceptions to Norris-LaGuardia. *Id*. at 14.

19  The Norris-LaGuardia Act is thus an independent basis for denying this motion.

20                                              **CONCLUSION**

21          For all of the foregoing reasons, Plaintiffs' request for a preliminary injunction should

22  be denied.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

23

1    Dated: December 27, 2024          Respectfully submitted,

2

3                                      */s/Paul L. More*
                                       Paul L. More, Bar No. 9228
4                                      Eric B. Myers, Bar No. 8588
                                       Kimberly C. Weber, Bar No. 14434
5                                      **MCCRACKEN, STEMERMAN & HOLSBERRY,**
6                                      **LLP**
                                       1630 S. Commerce Street, Suite A-1
7                                      Las Vegas, NV 89102
                                       Tel.: 702-386-5107
8                                      Fax: 702-386-9848
                                       Emails:  pmore@msh.law
9                                                ebm@msh.law
10                                               kcw@msh.law

11
                                       *Attorneys for Proposed Intervenor Local Joint Executive*
12                                     *Board*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Local Joint Executive Board's Opp. Br.                    Case No. 24-cv-01966-JCM-BNW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 27, 2024, I electronically transmitted the foregoing to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants:

*/s/Paul L. More*
Paul L. More

Attachment to Motion for Leave to File –
Declaration of Kevin Kline in Opposition
to Motion for Preliminary Injunction

1 | Paul L. More, Bar No. 9228
2 | Eric B. Myers, Bar No. 8588
Kimberly C. Weber, Bar No. 14434
3 | **MCCRACKEN, STEMERMAN & HOLSBERRY, LLP**
4 | 1630 S. Commerce Street, Suite A-1
Las Vegas, NV 89102
5 | Tel.: 702-386-5107
Fax: 702-386-9848
6 | Emails: pmore@msh.law
7 |           ebm@msh.law
           kcw@msh.law
8 |
9 | *Attorneys for Proposed Intervenor Local Joint Executive Board*

10 | **IN THE UNITED STATES DISTRICT COURT**

11 | **FOR THE DISTRICT OF NEVADA**

12 |

RED ROCK RESORTS, INC, et al.,                    **No. 24-cv-01966-JCM-BNW**

            Plaintiffs,

v.                                                **DECLARATION OF KEVIN KLINE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

NATIONAL LABOR RELATIONS BOARD, a federal administrative agency, et al.,

            Defendants.

I, Kevin Kline, declare:

1.      I am a Vice President of UNITE HERE International Union, the parent union of Culinary Workers Union Local 226 and Bartenders Union Local 165, which together comprise the Local Joint Executive Board of Las Vegas ("LJEB"). Among my duties as an International Vice President is to serve as the organizing director for gaming in Las Vegas, working with the LJEB. In that capacity, I oversee LJEB organizers and representatives at casinos owned by Plaintiff Red Rock Resorts, Inc. and operated by Plaintiff Station Casinos LLC ("Station"). The facts stated in this declaration are based on my personal knowledge and I could testify competently to them were I called on to do so.

2.      Station is a wholly-owned subsidiary of Red Rock Resorts, Inc. and operates "off-strip" casino properties in Las Vegas and surrounding areas. The controlling shareholders are brothers Frank Fertitta III and Lorenzo Fertitta.

3.      Starting in 2016, LJEB began seeking status as exclusive bargaining representative at Station properties through National Labor Relations Board ("NLRB") elections. It won an election at Boulder Station involving 577 workers on September 3, 2016 by 62% of voters, at Green Valley Ranch involving 833 workers on November 9, 2017 by 67% of voters, at the Palms involving 910 workers on April 28, 2018 by 84% of voters, at Sunset Station involving 588 workers on June 13, 2019 by 83% of voters, at Fiesta Rancho involving 195 workers on June 14, 2019 by 85% of voters, and at Fiesta Henderson involving 315 workers on September 13, 2019 by 57% of voters.

4.      In addition to these election wins, LJEB gained representational rights at Palace Station following an election involving 586 workers on October 16, 2016, which the Union lost by three votes. Station recognized LJEB in March 2017 as part of settlement agreement with NLRB Region 28 resolving unfair labor practice charges. These charges stemmed from Station's announcement after the Boulder Station election that all Station workers would receive free employee healthcare and reduced cost family health care except those at Boulder Station, where the Union would have to bargain for

them, as well a "promise-of-benefits" campaign targeting Palace Station workers during the run-up to the election there.

5.      LJEB also gained representational rights at Red Rock Casino Resort following an election held on December 20, 2019, which the Union lost (1,337 eligible voters, 46% in favor of union). This again followed a "promise-of-benefits" campaign in which Station announced free family health care, a 401(k) designed to mimic the LJEB's pension plan, free on-site health clinics, and other benefits. Station was ordered to bargain on an interim basis after this Court granted an injunction under 29 U.S.C. § 160(j). The NLRB subsequently found violations of the Act and ordered Station to bargain with LJEB. That bargaining has not taken place because Station appealed the order to the federal circuit court.

6.      LJEB's election wins and its recognition at Palace Station and Red Rock Casino have been undermined by Station's unfair labor practices. Since 2019, Station has wielded the promise and grant of better healthcare and retirement benefits as a weapon in order to avoid unionization and undermine the union after it had gained representation. Changing health care plans and pension benefits to try to match what LJEB-represented workers receive elsewhere sends the signal that unionization is unnecessary. That was the point of Station's changes in its benefits. For example, after corporate leadership had approved spending millions of dollars on changing Station's benefits, Station's Senior Vice President for Human Resources emailed a colleague with whom he had shared details of the illegal scheme: "You believe that???? The free health care and company paid 401(k) is going to devastate the union."

7.      Station combined this strategy with other unfair labor practices during the run-up to the Red Rock Casino election in December 2019, like discriminating against union supporters, threatening workers with job loss, and interrogating a union supporter.

8.      The NLRB subsequently described Station's plan as "extensive coercive and unlawful misconduct [that] stemmed from a carefully crafted corporate strategy intentionally designed at every step to interfere with employees' free choice." It said that

Declaration of Kevin Kline                           Case No. 24-cv-01966-JCM-BNW

"the centerpiece of the Respondent's unlawful campaign was its tri-part message promising and granting employees tremendous new benefits without the Union, threatening to withhold or withdraw these benefits if employees selected the Union, and implicitly threatening that selecting the Union could only lead to years of fruitless bargaining without any improvement to working conditions. This highly coercive combination of promises and threats was accompanied by a barrage of further unlawful conduct, including additional threats that selecting the Union would lead to withdrawal of favors, extras, or help that employees could otherwise expect from management, implicit threats of job loss related to strikes, and interrogation and discriminatory treatment of Union supporters."

9.     After engaging in this campaign, Station then unlawfully withdrew recognition from the Union at Boulder Station and Palace Station in August and September 2020, without an NLRB-led decertification election. In both cases, Station management illegally orchestrated a campaign to coerce employees to sign petitions seeking the removal of the Union as bargaining agent.  After Station had procured sufficient signatures to withdraw recognition at Boulder Station, its Chief Operating Officer texted Lorenzo Fertitta: "Lorenzo, wanted to give you the good news. Boulder decertification is complete. They received all the signatures needed." After it had done so at Palace Station, the Palace Station general manager wrote a colleague: "I got the dertification (sic) of the Union completed. We submitted to them yesterday. Fucking lost part of my life in taht (sic) process. Craziest deal ever." For years, Station has continued to publicize that it had withdrawn recognition at these casinos to worker at other properties, posting notices on bulletin boards in back of the house areas.

10.     The combined effect of Station's campaign of unfair labor practices was to dramatically reduce support for the Union at LJEB-represented properties. For example, at Boulder Station, in the four years after Station's benefits campaign and unlawful withdrawal of recognition from the Union, voluntary participation in the Union Leadership Committee, which is responsible for communicating with co-workers about

Declaration of Kevin Kline                          Case No. 24-cv-01966-JCM-BNW

union representation and actions, and for distributing material (such as flyers) to co-
workers providing them with updates, fell from 48 regular members to fewer than 10. At
Red Rock Casino, workers who had been wearing union buttons to demonstrate their
support, including committee leaders stopped doing so, and workers at the casino
stopped signing union authorization cards.

11.     All told over three years, LJEB successfully organized over 5,300 workers
at eight casino properties over three years, winning elections by a combined average of
65%. But today, following Station's massive ULP campaign, only one of these remains
unionized, and no collective bargaining agreement has ever been reached. I believe that
Station is banking on the theory that its scorched-earth ULP campaign will be too much
for the NLRB to remedy, at least within a meaningful timeframe.

12.     The unfair labor practice proceedings that Plaintiffs are seeking to enjoin
in this action have caused further deterioration in union support, particularly because it
has taken the NLRB years to even begin to address them. In the complaint known as
Citywide I, the NLRB General Counsel alleges that Station used the COVID-19
pandemic in a scheme to rid itself of union supporters through discriminatory layoffs,
transfers, recalls, and other job actions. At the same time, it orchestrated decertification
petitions at Boulder Station and Palace Station, and ultimately used those petitions as the
basis to withdraw recognition from LJEB at those properties on August 5, 2020 and
September 21, 2020. In a complaint referred to as "Citywide II", the NLRB General
Counsel alleges that Plaintiffs committed numerous unfair labor practices, including
discriminatorily firing workers for their union support and engaging in mass hiring to
avoid a Nevada law requiring the recall of workers laid off due to the COVID-19
pandemic, in retaliation for those workers' advocacy for that law.

13.     After the COVID-19 pandemic began, Station announced without advance
warning that on May 1, 2020 it was laying off full-time employees and discharging part-
time and on-call employees at six casinos that it planned to reopen when the government
eventually permitted it to do so (Boulder Station, Palace Station, Green Valley Ranch,

Red Rock Casino, Sunset Station and Santa Fe Station), and it was discharging all employees at four casinos that it was closing indefinitely (Palms, Fiesta Henderson, Fiesta Rancho, and Texas Station).

14.    Since September 2019, Station has used so called "MUD" lists, created at each property by supervisors classifying employees as "M" for pro-management, "U" for pro-union, or "D" for do not know. Internal company documents show that Station used these designations to decide whom to rehire after the pandemic-closures were lifted, whom to transfer to open positions, and whom to blacklist. Thus, for example, Station's COO wrote to casino general managers on June 13, 2020 requesting MUD lists from the four casinos that had closed indefinitely on May 1 as well as lists of hiring needs from the six that would stay open: "Please send Phil [Fortino] and I your MUD lists from [Fiesta Rancho], Texas [Station], [Fiesta Henderson] and Palms. Also, please resend your open positions requested sheets. Some were sent to me and some were sent to Phil. We need to make sure we both have the same version." Other documents demonstrate that managers made recommendations with respect to the rehiring of specific employees based on their "MUD" status. For example, one manager stated that "[l]ooking at the MUD list we have 13 [Guest Room Attendants] we would bring back, the remaining we would prefer external."

15.    The complaint in Citywide I opened for hearing in August 2021. However, because of subpoena enforcement proceedings and other delays, the presentation of evidence did not start until July 2024 and, absent an injunction, the trial is expected to last into 2025.

16.    The complaints being adjudicated in Citywide I and Citywide II are thus related to Station's anti-union actions that took place as early as 2019. The length of time that it has taken to even bring these serious complaints to trial before an administrative law judge has contributed to the belief, expressed to LJEB organizers, among many Station workers that federal labor law does not protect them and that supporting the Union is unprotected.

Declaration of Kevin Kline                              Case No. 24-cv-01966-JCM-BNW

1    17.    If an injunction is granted in this case further delaying adjudication of

2   Station's unfair labor practices, it will have a serious and irreparable impact on support

3   for the Union at Station properties, in my opinion. I expect that Station would publicize

4   such an injunction, fueling a sense of defeat among Station workers and weakening

5   union support.

6        I declare under penalty of perjury under the laws of the United States that the

7   foregoing is true and correct. Executed this 27 day of December 2024, at Las Vegas,

8   Nevada.

9

10                                      *Kevin Kline*
                                        Kevin Kline (Dec 27, 2024 13:45 PST)
11                                      KEVIN KLINE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Kevin Kline                          Case No. 24-cv-01966-JCM-BNW

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 27, 2024, I electronically transmitted the

foregoing to the Clerk's office using the CM/ECF System for filing and transmittal of a

Notice of Electronic Filing to all CM/ECF registrants:


*<u>/s/Paul L. More</u>*
Paul L. More

Declaration of Kevin Kline                                    Case No. 24-cv-01966-JCM-BNW

# 2024-12-27 Decl of K Kline (rev v2)

Final Audit Report                                                          2024-12-27

| | |
|---|---|
| Created: | 2024-12-27 |
| By: | Katherine Pierre (kpierre@msh.law) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAXgTtwhryloCGOfo14xsMUKWtKxb6o0mm |

## "2024-12-27 Decl of K Kline (rev v2)" History

📄 Document created by Katherine Pierre (kpierre@msh.law)
2024-12-27 - 9:38:42 PM GMT

📧 Document emailed to Kevin Kline (kkline@unitehere.org) for signature
2024-12-27 - 9:38:46 PM GMT

📄 Email viewed by Kevin Kline (kkline@unitehere.org)
2024-12-27 - 9:42:57 PM GMT

🖊 Document e-signed by Kevin Kline (kkline@unitehere.org)
Signature Date: 2024-12-27 - 9:45:46 PM GMT - Time Source: server

✅ Agreement completed.
2024-12-27 - 9:45:46 PM GMT


Adobe Acrobat Sign

1

## <u>CERTIFICATE OF SERVICE</u>

2

     I hereby certify that on December 27, 2024, I electronically transmitted the

3

foregoing to the Clerk's office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to all CM/ECF registrants:

5

6

                   */s/Paul L. More*
                   Paul L. More

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Motion for Leave to File                          Case No. 24-cv-01966-JCM-BNW